UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| STUDENT DOE<br>by Parent and Next Friend FATHER DOE,<br><br>Plaintiff,<br><br>v.<br><br>LAURA PERILLE,<br>Superintendent of Boston Public Schools,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 18-11875-DJC |

## MEMORANDUM AND ORDER

CASPER, J.                                                                                                                                 November 6, 2018

### I.    Introduction

Plaintiff Student Doe ("Doe"), through Doe's parent and next friend Father Doe, has filed this *pro se* lawsuit against Defendant Laura Perille ("Perille"), in her official capacity as Superintendent of Boston Public Schools, asserting violations of Doe's constitutional rights and the McKinney-Vento Act, 42 U.S.C. § 11431 *et seq.*, in connection with the withdrawal of Doe's admission to the Boston Latin School ("BLS") for the 2018-19 academic year. D. 5; D. 11; D. 12. Doe seeks injunctive relief requiring that Doe be allowed to attend BLS this year. Id. For the reasons discussed below, Doe's motions are DENIED.

### II.    Standard of Review

Injunctive relief "is an 'extraordinary and drastic remedy.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). To obtain such relief, the Court must consider: (1) the movant's

1

likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm if the injunction is not granted; (3) the balance of equities between the parties; and (4) whether granting the injunction is in the public interest. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). Doe "bears the burden of establishing that these four factors weigh in [his] favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006); see Rivera-Vega v. ConAgra, Inc., 70 F.3d 153, 164 (1st Cir. 1995) (quoting Pye ex rel. NLRB v. Sullivan Bros. Printers, 38 F.3d 58, 63 (1994)) (noting that when the relief sought by the moving party "is essentially the final relief sought, the likelihood of success should be strong") (emphasis in original) (internal quotation marks omitted).

### III. Factual Background

Unless otherwise noted, the following facts are drawn from the complaint, D. 1, Doe's motions for injunctive relief, D. 5; D. 11; D. 12, Perille's opposition, D. 17, and the parties' supporting documents.[1]

#### A. Boston Latin School

BLS is a public school for seventh through twelfth grade students within the Boston Public Schools ("BPS"). BOSTON LATIN SCHOOL ADMISSIONS FAQS, https://www.bls.org (last visited Nov. 5, 2018). BLS is one of three "exam schools" in BPS. Id. BLS, in particular, has been described as "one of the best schools in the whole country," id., and the "crown jewel of the city's school system," D. 19 at 34. To be eligible for admission to BLS, students must (1) apply to the school when they are in either sixth or eighth grade, (2) receive a certain score on the Independent Schools Entrance Exam ("ISEE"), (3) maintain a certain grade point average and (4) reside in

---

[1] The Court has "broad discretion in deciding what evidence to consider in connection with a motion for preliminary injunction" or other injunctive relief. Rice v. Wells Fargo Bank, N.A., 2 F. Supp. 3d 25, 31 (D. Mass. 2014).

Boston. BOSTON LATIN SCHOOL ADMISSIONS FAQS, https://www.bls.org (last visited Nov. 5, 2018).

**B.** **BPS Residency Policy**

BPS utilizes a student residency requirement for all schools within its jurisdiction. D. 19 at 16-20. Pursuant to the BPS residency policy, "a student must actually reside in the City of Boston." Id. at 16. The policy defines residency as "the place where a person dwells permanently, not temporarily, and is the place that is the center of his or her domestic, social, and civic life." Id. The residence of a minor child is "presumed to be the primary, legal residence of the parent(s) or guardian(s) who has physical custody of the child." Id. Temporary residence in the City of Boston "solely for the purpose of attending a Boston public school, shall not be considered residency." Id. In determining a student's residency, "Boston Public Schools reserves its right to request a variety of documentation and to conduct Investigation into where a student actually resides." Id. In addition, "[b]ecause residency can, and does, change for students and their families during the course of the academic year, [BPS] may continue to verify residency after the commencement of classes." Id.

For admission to exam schools, including BLS, BPS requires students to prove their Boston residency "no later than the first Friday in November for matriculation the following September." Id. at 10. This policy may be, in part, a response to concerns that non-resident parents "go to great lengths" to skirt Boston residency requirements so their children can attend BLS. Id. at 34 (describing the residency proposal for BPS exam schools in an article in *The Boston Globe* dated April 23, 2010). The residency policy represents "the latest effort to crack down on residency fraud in the city's school system." Id.

Violations of the residency policy may result in strict penalties, including "[i]mmediate dismissal from school" and "[p]er diem fines for the educational and related services" provided to nonresidents. Id. at 10. Students who are dismissed from BPS schools for failure to prove their Boston residency "may appeal this determination through the Office of the Ombudsperson, whose shall be final." Id. at 11. Any such appeal must be made within ten days of the dismissal notice. Id.

### C. BPS's Withdrawal of Doe's Admission to BLS

In November 2017, Doe's mother ("Mother Roe") registered Doe for the ISEE. D. 1 ¶ 13. Mother Roe provided an address on Canal Street in Boston (the "Canal Street address") on the BPS residency verification forms, as well as a credit card statement, a Massachusetts driver's license and a social security card application that referenced the Canal Street address. D. 19 at 37-42. Doe took the ISEE in November 2017, D. 1 ¶ 14, and was invited to attend BLS in March 2018, id. ¶ 15. On June 15, 2018, BPS's Ombudsperson, Carolyn MacNeil ("MacNeil"), who is responsible for verifying student residency and enforcing the BPS residency policy, informed Mother Roe that Doe would be denied entrance to BLS for the 2018-19 academic year because Doe did not actually reside in Boston. D. 1 ¶ 17; D. 1-2 at 43. MacNeil also noted that Doe could appeal the decision in writing within ten days. D. 1-2 at 43.

Several weeks after the deadline, on July 15, 2018, Mother Roe notified MacNeil via email that Doe intended to appeal the decision. Id. at 45. Mother Roe also requested the factual and legal basis for BPS's decision and an "opportunity to present [Doe's] side of the case." Id. That day, MacNeil explained in an email that, among other things, the Canal Street address Mother Roe provided on Doe's residency verification forms was confirmed by the City of Boston Assessor's Office to be a commercial building (not a residential address), and that the BPS letter denying

4

Doe's admission to BLS was returned to BPS as undeliverable. Id. at 48. MacNeil also noted that BPS's residency investigator had successfully delivered the same letter to an address in Easton, Massachusetts. Id. In response, Mother Roe provided additional information regarding Doe's intent to reside in Boston, including the fact that Mother Roe had unsuccessfully attempted to purchase a house in Boston in September 2017 and, since October 2017, Mother Roe "continued to be a Boston resident staying either in various hotels or in friends' or relatives' homes in places ranging from Canada to Florida." Id. at 47. She did not, however, provide a Boston address. Id. Mother Roe concluded by requesting a hearing and explaining that Doe's inability to attend BLS would "hamper [Doe's] development." Id. In a letter, dated July 19, 2018, MacNeil explained that, in addition to her personal review of Doe's case file and the information Mother Roe provided on appeal, BPS's Residency Review Committee and the Superintendent's Chief of Staff had reviewed Doe's appeal and decided to deny it. Id. at 50. MacNeil noted that the letter served as BPS's final response on the matter. Id.

## IV. Procedural History

On August 31, 2018, Doe instituted this lawsuit. D. 1. That day, Doe also filed motions seeking a preliminary injunction and temporary restraining order. D. 5; D. 11. On September 4, 2018, after Perille was properly served, Doe filed another motion for temporary restraining order. D. 12. On October 4, 2018, the Court heard the parties on the pending motions and took this matter under advisement. D. 27.

Doe also moved for preliminary injunction against Perille on similar grounds in Suffolk Superior Court. D. 19 at 126-55. The same was denied on August 24, 2018. Id. at 145. Shortly thereafter, Doe filed an emergency motion for temporary restraining order in Suffolk Superior Court, which was denied on September 4, 2018. D. 19 at 166-220. Doe's appeal of the court's

5

order on the preliminary injunction was denied by the Massachusetts Appeals Court on September 7, 2018. D. 19 at 222.

V.      **Discussion**

   A.      **Likelihood of Success on the Merits**

Although the Court considers all factors of the injunctive relief analysis, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011).

Doe has not alleged distinct, enumerated counts, but has rather averred constitutional violations in several paragraphs throughout the complaint. D. 1. As best the Court can discern, Doe asserts the following constitutional claims against Perille: 1) a procedural due process claim; 2) a violation of the Fourteenth Amendment's Equal Protection Clause; and 3) violation of Doe's rights under the Privileges and Immunities Clause of the Constitution. Id. Doe also alleges that Perille violated the McKinney-Vento Act, 42 U.S.C. § 11431 *et seq.*[2] The Court construes Doe's constitutional and statutory claims against Perille, in her official capacity as Superintendent of BPS, as claims brought pursuant to 42 U.S.C. § 1983. To prevail on a claim brought under § 1983, a plaintiff must show both: "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Chongris v. Bd. of Appeals, 811 F.2d 36, 40 (1st Cir. 1987). Neither party

---

[2] The complaint includes a breach of contract claim and other alleged violations of state law. Doe asserts, however, that the "complaint and all of its pleadings or motions or other documents, including those in the future, only seek recourse under violations of the United States Constitution or United States Federal Laws." D. 1 ¶ 1. Accordingly, it appears that Doe is not pursuing any state law claims in this case.

disputes that the first element is satisfied in this case. The Court now considers Doe's likelihood of success on the merits of his claim that Defendant's conduct amounted to a violation of his constitutional or statutory rights.

*1. Procedural Due Process*

Doe appears to assert that the withdrawal of his admission to BLS deprived him of a protected interest in a public school education without a hearing in violation of the Fourteenth Amendment's procedural due process requirements. D. 1 ¶¶ 32-36. To plausibly allege a procedural due process claim, a plaintiff "must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process." González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (quoting Aponte–Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006)) (alteration in original). The threshold question is whether Doe has identified a protected liberty or property interest at stake. As Perille points out, there is no federal constitutionally protected right to an education. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973) (explaining that "[e]ducation, of course, is not among the rights afforded explicit protection under our Federal Constitution" nor is there "any basis for saying it is implicitly so protected"); see Thomas v. Springfield Sch. Comm., 59 F. Supp. 3d 294, 309 (D. Mass. 2014) (citing Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006)) (stating that the "Constitution does not guarantee a right to a public education"). States are not "constitutionally obligated to establish and maintain a public school system." Goss v. Lopez, 419 U.S. 565, 574 (1975). If a state provides a public school system and requires students to attend, then it is "constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which

may not be taken away . . . without adherence to the minimum procedures required by that Clause." Id.

In Massachusetts, "[e]very person shall have a right to attend the public schools of the town where he actually resides." Mass. Gen. L. c. 76, § 5. Accordingly, students in Massachusetts have a legally protected property interest in a public school education to the extent they attend schools in the towns in which they reside. Perille asserts that Doe has not provided any reliable proof of his residence in Boston. Doe, for his part, has submitted the following documents in support of his residency, including documents the Court understands were not provided to BPS prior to its decision to deny Doe's admission to BLS in June 2018: two plane tickets from Baltimore, Maryland to Boston, Massachusetts from October 2017 (a month before Mother Roe completed BPS's residency verification forms), D. 1-2 at 12-13; a reservation for one night at a hotel in Boston in October 2017, id. at 15; an unexecuted purchase and sale agreement for a house in Boston, id. at 17-23; a lawsuit filed by Father Doe in Massachusetts Land Court regarding the real estate in question, D. 19 at 73-88; email communications from September 2017 regarding Father Doe's offer to purchase a house in Boston, D. 19 at 71; documents, including a driver's license and credit card statement, that reference the Canal Street address, see, e.g., id. at 43; id. at 47; and, most recently, a one-year lease agreement that Mother Roe purportedly entered for an apartment in Boston beginning in September 2018, D. 1-2 at 52-62. Mother Roe and Father Doe have also filed unsigned affidavits in support of Doe's Boston residency. D. 1-2 at 29-32, 100-9. At best, the affidavits and supporting evidence suggest that Mother Roe was interested in making Boston her residence (and, by extension, Doe's residence). Moreover, none of the proffered evidence is consistent with Mother Roe's assertion that she and Doe resided at the Canal Street address, as claimed in the BPS residency verification forms. Without more, the Court does not agree that Doe

8

was a bona fide resident of Boston entitled to attend a BPS school when Mother Roe submitted the residency verification paperwork in November 2017, when BPS rescinded Doe's admission to BLS in June 2018, or even now.

For support, Doe relies upon Ding ex rel. Ding v. Payzant, No. CIV. A. 03-5847, 2004 WL 1147450 (Mass. Super. May 20, 2004), but that case is not persuasive on the facts before this Court. In Ding, the court held that once students are "granted places at [a] school, they have a property interest in continued enrollment." Ding, No. CIV. A. 03-5847, 2004 WL 1147450, at *11. The students at issue in that case were accepted into BLS, formally enrolled and had attended over three months of classes before BPS determined that they were not residents of Boston. Ding, No. CIV. A. 03-5847, 2004 WL 1147450, at *1. By contrast, here, BPS concluded that Doe had not been and was not a resident of Boston and the same is true based upon the record before the Court. Accordingly, Doe does not have a legally protected interest in enrollment at BLS since he has failed to establish that he was a resident of Boston.

Even assuming *arguendo* that Doe had shown that he was a resident of Boston, the Court concludes that Doe received all the process that he was due under the Fourteenth Amendment. In Goss, which Doe principally relies upon, the Supreme Court considered the minimum procedural protections that school districts in Ohio owed students facing suspension from school for up to ten days. Goss, 419 U.S. at 579. Balancing the students' interest in "avoid[ing] unfair or mistaken exclusion from the educational process," id., and the State's interest in a disciplinary system that allows schools to maintain order and perform their educational function, id. at 580, the court concluded that due process requires, at a minimum, "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story," id. at 581 (addressing school suspension

of ten days or less). The court emphasized, however, that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." Id. at 579. Accordingly, the court found that "an informal give-and-take between student and disciplinarian, preferably prior to the suspension" was all that due process requires. Id. at 584.

In Ding, the court similarly considered the competing interests at stake in determining the nature and extent of the procedural safeguards owed to students prior to their dismissal from BLS. See Ding, No. CIV. A. 03-5847, 2004 WL 1147450, at *12. There, the court recognized that students possess a "strong" interest in "avoiding an erroneous determination of non-residency, with consequent exclusion from a school they are entitled to attend," even where, as here, the student at issue is not being deprived of all public schooling and could enroll in the school district where they do reside. Id. The court also determined that BPS's "strong" interest in "avoiding the burden of educating students not actually residing in Boston, preserving limited places at Boston Latin School for Boston residents, and preserving the credibility of the residency requirement" require that, as a general matter, BPS be "permitted to act promptly when it has reason to believe that an enrolled student does not meet the residency requirement." Id. In view of the interests at stake and the absence of a Massachusetts authority on point, the court applied "the procedural standard established in [Goss]" to its consideration of BPS's residency determination. Id. Consistent with Goss, the court concluded that the plaintiffs were "entitled to notice of the allegation that the students were not residents of Boston, some explanation of the basis for that allegation, and an opportunity to present their side." Id.

Doe alleges that "he will incur significant harm of lost educational opportunity if he is unable to attend BLS, a world renown[] magn[et] school well suited to his abilities." D. 12 ¶ 30.

Doe therefore has a strong interest in avoiding an erroneous determination of non-residency. Perille, on the other hand, possesses a strong interest in enforcing the residency requirement to combat BPS's long-standing issue of residency fraud; to "ensure fairness in residents' access to public school placement," including the limited number of seats available at the "highly-sought after" exam schools; and to "protect taxpaying families from paying for nonresidents' education free-of-charge." D. 18 at 10. Unlike the students in Ding, Doe received notice of the allegations that he did not meet the Boston residency requirement, see D. 19 at 53, an explanation for the basis for that allegation, see id. at 61, and an opportunity to present his side in writing, id. at 61-62. It is worth noting that Doe received the aforementioned process despite the fact that he missed the ten-day window to appeal BPS's residency determination by nearly a month. Doe, nevertheless, argues that he was entitled to a hearing. D. 12 ¶ 11. To the contrary, nothing in the Supreme Court's ruling in Goss, which is controlling here, compels the Court to conclude that due process requires BPS to hold a formal hearing prior to making residency determinations. See Goss, 419 U.S. at 583 (explaining that its holding "stop[ped] short of construing the Due Process Clause to require, countrywide, that hearings . . . must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident"). The Supreme Court recognized that "impos[ing] in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness." Id. Requiring BPS to hold a hearing to resolve every residency disputes, especially where, as here, the student failed to provide any evidence sufficient to establish his residency when given the opportunity, "invites not due process but a waste of process." Orozco by Arroyo v. Sobol, 703 F. Supp. 1113, 1118-19 (S.D.N.Y. 1989) (explaining that a local school district was not required to

11

provide a hearing for a student "whose residency for school purposes [wa]s a matter of great dispute") (emphasis in the original). The Court concludes that BPS's residency verification process, as applied here to Doe, satisfies the Fourteenth Amendment. Doe received all process that he was due, including notice of BPS's determination regarding his residency status, the evidence underlying BPS's determination and the opportunity to present evidence in support of his residency nearly a month after the appeal deadline had passed. Accordingly, the Court concludes that Doe is not likely to succeed on the merits of his procedural due process claim.

    2.    *Equal Protection*

Doe also argues that Perille's enforcement of the BPS residency policy against him violates the Equal Protection Clause of the Fourteenth Amendment. D. 1 ¶¶ 14-22. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Doe asserts he was treated differently from other Boston residents in violation of the Equal Protection Clause because BPS requires exam school applicants to establish their residency nearly a year prior to matriculation. See D. 5 ¶¶ 14-22; see also D. 19 at 10 (explaining that students who are not currently enrolled in BPS will not be considered for admission to an exam school unless they establish their Boston residency "no later than the first Friday in November for matriculation the following September"). To the contrary, the record before the Court indicates that BPS's decision regarding Doe's admission was based on failure to comply with BPS's requirement that students must reside in Boston to attend any BPS school, including exam and non-exam schools. D. 19 at 54 (explaining in a June 2018 letter to Mother Roe that BPS had determined that Doe "does not actually reside in the City of Boston, in violation of the Boston Public School's Residency Policy, BPS Enforcement Strategy, and Massachusetts Laws Chapter 76 Section 5"). Doe, therefore, has no basis to

12

challenge the exam school residency requirement since he was denied admission to BLS because he failed to establish he was a Boston resident at any point.

To the extent Doe challenges BPS's general residency requirement, his reliance on Shapiro v. Thompson, 394 U.S. 618, 628 (1969), overruled in part, Edelman v. Jordan, 415 U.S. 651 (1974) is misguided. In recognition of citizens' right to travel between the several states, the Supreme Court has on several occasions, including in Shapiro, "invalidated requirements that condition receipt of a benefit on a minimum period of residence within a jurisdiction." Martinez v. Bynum, 461 U.S. 321, 325 (1983). The Supreme Court "has been careful to distinguish such durational residence requirements from bona fide residence requirements." Id. Since its ruling in Shapiro, the Supreme Court has repeatedly approved "bona fide residence requirements" in the field of public education. Martinez, 461 U.S. at 326. In Martinez, for example, the court explained that "[a] bona fide residence requirement . . . furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents" and that "[s]uch a requirement with respect to attendance in public free schools does not violate the Equal Protection Clause of the Fourteenth Amendment." Id. at 328-29 (noting further that bona fide residence requirements for public schools "do[] not burden or penalize the constitutional right of interstate travel, for any person is free to move to a State and to establish residence there"). In that case, the Supreme Court upheld the constitutionality of a statute that provided students with tuition-free admission to public schools in the districts in which they resided, except where their "presence in the school district is for the primary purpose of attending the public free schools." Id. at 323 (citation and internal quotation marks omitted). Likewise, the BPS residency requirement—which defines residency as the "place where a person dwells permanently, not temporarily" and where a person centers their "domestic, social, and civic life," D. 19 at 10—satisfies the Supreme Court's "traditional, basic

13

residence criteria," *i.e.*, "to live in the district with a bona fide intention of remaining." Id. at 332. Where, as here, a residency policy "simply requires that the person does establish residence before demanding the services that are restricted to residents," the policy does not violate the Fourteenth Amendment. Id. at 329 (emphasis in original). The Court, therefore, holds that Doe is unlikely to succeed on the merits of his equal protection claim.

        3. *Privileges and Immunities Clause*

The "Privileges and Immunities Clause gives constitutional assurance that [t]he [c]itizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Util. Contractors Ass'n of New England, Inc. v. City of Worcester, 236 F. Supp. 2d 113, 116–17 (D. Mass. 2002) (quoting U.S. Const. art. IV, § 2, cl. 1) (internal quotation marks omitted). Doe alleges that the enforcement of BPS's residency requirement against him violates his right to "interstate movement as guaranteed by the 'Privileges and Immunities [C]lause.'" D. 1 ¶ 29. For the reasons explained with respect to Doe's equal protection claim, Doe's claim pursuant to the Privileges and Immunities Clause is also unlikely to succeed on the merits.

        4. *McKinney Vento Act*

Doe also brings a claim for violation of the McKinney-Vento Act, 42 U.S.C. § 11431 *et seq.*, which was enacted for the purpose of ensuring that "each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education." 42 U.S.C. § 11431(1). Pursuant to the McKinney-Vento Act, homeless children must receive that to which they are entitled in Massachusetts: a free public school education. See Sylvia's Haven, Inc. v. Mass. Dev. Fin. Agency, 397 F. Supp. 2d 202, 205 (D. Mass. 2005). The McKinney-Vento Act confers rights on homeless children that are enforceable under 42 U.S.C. § 1983. See Lampkin v.

14

District of Columbia, 27 F.3d 605, 611 (D.C. Cir. 1994). Homeless children, therefore, have a private cause of action pursuant to § 1983 to enforce provisions of the McKinney-Vento Act.

Doe asserts that BPS's residency decision constituted a violation of the McKinney-Vento Act. As an initial matter, the Court notes that homeless children are exempt from BPS's residency requirement. D. 19 at 13. Pursuant to the policy, parents of homeless children are encouraged to contact BPS's Welcome Center for assistance with registration and, if applicable, to provide a letter verifying their residence at a homeless shelter. Id. Doe has neither alleged that he applied to BPS as a homeless student nor that BPS was otherwise aware of his purported homelessness prior to the institution of this lawsuit. However, even assuming that Doe followed the procedures for homeless students set forth in BPS's residency policy, it is unlikely that he qualifies as homeless under the McKinney-Vento Act.

Pursuant to the McKinney-Vento Act, a child is "homeless" if he or she lacks a "fixed, regular, and adequate nighttime residence." 42 U.S.C. § 11434a(2)(A). This definition includes "children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason; are living in motels, hotels, trailer parks, or camping grounds due to the lack of alternative adequate accommodations." 42 U.S.C. § 11434a(2)(B). Although few courts have had occasion to interpret the meaning of "homeless" under the McKinney-Vento Act, the existing case law suggests that children who have alternative adequate living arrangements available to them do not qualify as homeless for the purposes of the Act. See, e.g., J.S. ex rel. S.S. v. Red Clay Consol. Sch. Dist., No. CV 15-876-LPS, 2015 WL 5920316, at *2 (D. Del. Oct. 8, 2015) (concluding that plaintiffs were not homeless where, after their mother lost her apartment in one school district, she sent them to live with their father—who held joint custody—in another school district); Mangiafico v. State Bd. of Educ., 138 Conn. App. Ct. 677, 693 (2012)

(determining that the plaintiff was not a homeless child under the McKinney-Vento Act when his family was forced to move to a rental property after their home was deemed uninhabitable); cf., Lampkin v. District of Columbia, 879 F. Supp. at 122–23 (D.D.C. 1995) (holding that families living in shelters and families on the waiting list to enter shelters were homeless pursuant to the McKinney-Vento Act). Setting aside the factual incongruity between Doe's assertions of homelessness and Father Doe's and/or Mother Roe's ability to make a ten thousand dollar down payment towards a house valued at one million dollars, D. 19 at 64-70, the Court concludes that Doe does not fall within the McKinney-Vento Act's definition of homeless where there apparently were fixed, regular and adequate nighttime residences available to him during the relevant time period. For example, the record indicates that Doe's paternal uncle resides in Easton, Massachusetts, D. 1-2 at 31, that Doe receives mail at this address, id. at 48, and that Mother Roe chose to stay in hotels and with friends while waiting for the resolution of a case in Massachusetts Land Court concerning the house she was attempting to purchase, see id. at 103. On this record, Doe is unlikely to succeed on the merits of his claim pursuant to the McKinney-Vento Act.

### B. Irreparable Harm

To obtain injunctive relief, Doe must also show a "significant risk of irreparable harm if the injunction is withheld." Nieves-Márquez v. P.R., 353 F.3d 108, 120 (1st Cir. 2002). Doe alleges that he will suffer significant harm if he cannot attend BLS. D. 12 ¶ 30. The Court does not doubt that Doe will be impacted by the inability to attend BLS, an elite public school, this year. Doe's claim, however, that he will be irreparably harmed is undermined, at minimum, by the facts that Doe was homeschooled prior to applying to BLS and there is no indication that the choice of continued homeschooling will have a negative impact on Doe's educational opportunities, and that there is no indication that Doe cannot attend a public school wherever he actually resides.

### C. The Balance of Harms and the Public Interest

The final considerations in weighing the grant of a preliminary injunction are "a balance of equities in the plaintiff's favor, and [] service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, 794 F. 3d 168, 171 (1st Cir. 2015). Here, Doe argues that without injunctive relief, he will suffer significant harm if he is unable to attend BLS and receive the "best education possible" so that he "may go on to become [a] productive contributing member[] of society." D. 12 ¶ 32. Conversely, if the injunction is granted, BPS risks an inability to prevent "residency fraud, misuse of taxpayer dollars, and usurpation of the limited available school seating for actual Boston residents." D. 18 at 15. On this record, the balance tips in BPS's favor, since its interests are also in the interest of all bona fide residents of Boston. In light of BPS's strong interest in preserving its limited resources for students who actually reside in Boston and given that Doe has not established a substantial likelihood of success on the merits, the Court declines to impose the extraordinary form of relief that Doe has requested.

### VI. Conclusion

For all of the aformentioned reasons, Doe's motions, D. 5; D. 11; D. 12, are DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge